T.C. Memo. 1995-497


UNITED STATES TAX COURT


ANDREW ZARDS AND MARGITA ZARDS, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 20388-91, 20389-91,    Filed October 16, 1995.
    20390-91, 2277-93.

GS is an S corporation, and Ps' claimed losses
passed through from GS.  R disallowed Ps' losses on
various grounds including Ps' failure to (1) establish
that the losses were incurred in a trade or business
for the production of income and (2) substantiate that
the expenses giving rise to the losses actually were
incurred or paid.
    <u>Held</u>:  R's disallowance is sustained.  Ps failed
to prove that GS was carrying on a trade or business
during the years in issue and that GS ever incurred or
paid its claimed expenses.

<u>Victoria M. Brown</u>, for petitioners.

<u>Diane R. Mirabito</u>, for respondent.

---

[1]    Cases of the following petitioners are consolidated
herewith:  Janet Weinman, docket No. 20389-91; Vincent Donahue,
docket No. 20390-91; and Valdis and Vaida Vipulis, docket No.
2277-93.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  These cases have been consolidated for trial, briefing, and opinion.  Respondent has determined deficiencies in income tax and additions to tax as follows:

Andrew and Margita Zards - Docket No. 20388-91

| | | Additions To Tax | |
| | | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1)(A) | 6653(a)(1)(B) |
| 1986 | $2,580 | $129 | * |

Janet Weinman - Docket No. 20389-91

| | | Additions To Tax | | | |
| | | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6661 | 6653(a)(1) | 6653(a)(1)(A) | 6653(a)(1)(B) |
| 1986 | $42,113 | $10,528 | --- | $2,106 | * |
| 1987 | 13,206 | 3,302 | --- | 660 | * |
| 1988 | 5,824 | 1,456 | $291 | --- | --- |

Vincent Donahue - Docket No. 20390-91

| | | Additions To Tax | | | |
| | | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6661 | 6653(a)(1) | 6653(a)(1)(A) | 6653(a)(1)(B) |
| 1986 | $193,361 | $48,408 | --- | $9,682 | * |
| 1987 | 56,203 | 14,051 | --- | 2,810 | * |
| 1988 | 27,341 | 6,835 | $1,367 | --- | --- |

Valdis and Vaida Vipulis - Docket No. 2277-93

| | Additions To Tax | | |
| | Sec. | Sec. | Sec. |
| Year | 6653(a)(1) | 6653(a)(2) | 6661 |
| 1985 | $2,290 | ** | $11,449 |

  *  50% of sec. 6601 interest due on the deficiency amount.
  ** 50% of the interest due on $45,797.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The common denominator in these consolidated cases is the claim of tax losses arising from an investment in Good Shepherd Home, Inc. (Good Shepherd), an S corporation within the meaning of section 1361. We must determine whether such losses are allowable, and, if not, whether petitioners are liable for the additions to tax determined by respondent.[2]

FINDINGS OF FACT

Introduction

Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and the accompanying exhibits are incorporated herein by this reference. Petitioners Andrew and Margita Zards are individuals who made a joint return of income for 1986 and who resided in Lisle, Illinois, at the time their petition was filed. Petitioner Andrew Zards became a shareholder of Good Shepherd on March 17, 1986. Petitioners Janet Weinman and Vincent Donahue are individuals who resided in New York, New York, at the time their petitions were filed. Petitioners Weinman and Donahue both

---

[2] We need determine no deficiency for petitioners Vipulis for 1985. Their losses from Good Shepherd Home, Inc., for that year were subchapter S items, within the meaning of sec. 6245. The tax treatment of those items is determined at the corporate level. See sec. 6242. The proper treatment of those items was the subject of a proceeding before this Court: Good Shepherd Home, Inc., Valdis Vipulis, Tax Matters Person v. Commissioner, docket No. 28415-89. Our decision in that case resulted in the disallowance of substantially all of the losses from Good Shepherd Home, Inc., claimed by petitioners Vipulis for 1985. We must still, however, decide the additions to tax.

became shareholders of Good Shepherd on January 6, 1986.
Petitioners Valdis and Vaida Vipulis are individuals who made a
joint return of income for 1985 and resided in Cold Springs, New
York, at the time their petition was filed. Petitioner Valdis
Vipulis became a shareholder of Good Shepherd on December 8,
1985.

Good Shepherd is an Indiana corporation, incorporated on
December 30, 1985.

All of petitioners, and Good Shepherd, are calendar year
taxpayers. (We will use the term "shareholders" to refer to
those petitioners who were shareholders of Good Shepherd.)

The Property, Ona Pranckeviciute, and Lithuanian Good Shepherd
Home

Central to our discussion is a parcel of real property
located in Cedar Lake, Indiana (the property). Sometime during
the summer of 1982, Ona Pranckeviciute (Ona) purchased the
property from the Salesian Society, Inc. (Salesian). In the
contract of sale between Ona and Salesian, the property is
described as an approximately 86-acre tract containing the
following improvements: scholastic building, cafeteria,
dormitories, gymnasium, chapel, and water plant. Ona agreed to
pay $1 million for the property. She paid $100,000 immediately,
and she agreed to pay the remaining $900,000 in installments,
without interest, her installment obligation (the Salesian
obligation) being secured by a mortgage against the property (the

first mortgage). Ona subsequently conveyed title to the property to Lithuanian Good Shepherd Home, Inc. (Lithuanian), an Illinois corporation. Ona was president of Lithuanian. Lithuanian is a corporation unrelated to Good Shepherd. Ona intended to convert the property from a school to a nursing home serving the Lithuanian community.

Ona was unsuccessful in obtaining a license to operate a nursing home on the property. Nevertheless, sometime prior to 1985, three or four elderly individuals took up residence on the property. Ona charged each a fee of $10,000, in advance, for 5 years of residency. The fee was to cover the expense of room and board during the 5-year period.

In 1984, Kasa Lithuanian Federal Credit Union (Kasa) loaned $250,000 to Lithuanian to be used to bring the first mortgage current and for improvements on the property. Lithuanian's obligation to Kasa (the first Kasa obligation) was secured by a second mortgage against the property (the first Kasa mortgage).

Litas, Vebeliunas, and Good Shepherd

Litas Investing Co., Inc. (Litas), is a New York corporation. In September 1985, Litas purchased the property from Lithuanian. The property was conveyed to Litas by quitclaim deed. The president of Litas was Vytautas Vebeliunas (Vebeliunas).

Vebeliunas was also president of Good Shepherd during each of the years in issue. Moreover, Vebeliunas was the founder of

Kasa, one of its original directors, and its first president.  On October 2, 1985, Vebeliunas, as president of Good Shepherd, executed a note obligating Good Shepherd to pay Kasa $160,000 (the second Kasa obligation).  On that same date, also as president of Good Shepherd, Vebeliunas executed a mortgage on the property (the second Kasa mortgage) to secure payment of the second Kasa obligation.  The second Kasa mortgage recites that it is subordinate to the first mortgage, which is stated to have an approximate principal balance of $900,000.  Also on October 2, 1985, Vebeliunas, as president of Good Shepherd, and Kasa entered into a mortgage consolidation agreement (the consolidation agreement), whereby the first and second Kasa mortgages were consolidated, to secure total debts of $410,000 (the consolidated Kasa mortgage).  The consolidation agreement also recites that it is subordinate to the first mortgage, which is stated to have an approximate principal balance of $900,000.

In December 1985, Vebeliunas, as president of Litas, executed an indenture in favor of Salesian under which (1) Litas agreed to pay to Salesian $760,000 and (2) accorded to Salesian a mortgage in the property to secure that obligation (the first Litas indenture).  In December 1986, Vebeliunas, as president of Litas, executed a second and similar indenture in favor of Salesian, except that the amount of debt was recited to be $600,000 (the second Litas indenture).

On December 12, 1985, Vebeliunas, as president of Litas, executed a mortgage assumption agreement whereby Litas assumed the first Kasa obligation (the Litas assumption).

Good Shepherd:  Organization and Operations

The articles of incorporation of Good Shepherd provide that Good Shepherd is formed for the following purposes:

> Clause (a).  To carry on the business of acquiring, constructing, owning, managing or operating nursing homes and other health care facilities, including health care facilities licensed by the Indiana Health Facilities Licensing Council, and performing all other legal activities related thereto.

> Clause (b).  To act as agent of or representative for any one or more corporations, associations, partnerships, individuals, or other legal entities, to the extent that such activities are lawful under the Act.

> Clause (c).  To transact any or all lawful business for which corporations may be incorporated under the Act.

Prior to its involvement with the property, Good Shepherd had never operated a nursing home or a health care or medical facility.  None of Good Shepherd's officers had operated a nursing care, elder care, or health care facility.  Good Shepherd has never received a license from the State of Indiana to operate the property as a nursing home, nursing care facility, or other medical facility.  Good Shepherd has never received a license to operate an elder care facility on the property.  Good Shepherd has never obtained Medicaid or Medicare certification for the

property.  Good Shepherd did not operate a nursing home or other medical facility in any of the years in issue.

For 1986, 1987, and 1988, Good Shepherd reported small amounts of income, received either from the sale of livestock raised on the property or timber harvested from the property.  No income was reported from individuals residing on the property. The elderly individuals residing on the property when it was acquired from Ona remained in residence until at least 1987.  The obligation to provide room and board to those individuals was assumed as part of, and reduced proportionately, the purchase price of the property.

For 1986 through 1988, Good Shepherd made its returns of income on Form 1120S, U.S. Income Tax Return for an S Corporation.  For 1986 and 1988, Good Shepherd entered the description "Nursing home" on the line requiring a description of its business activity.  For 1987, it left that line blank.  Good Shepherd reported income of $7, $486, and $697 for 1986 through 1988, respectively.  Good Shepherd claimed the following deductions for 1986 through 1987:

| Year | Interest Expense | Depreciation | Other Deductions | Tax | Repairs |
|------|------|------|------|------|------|
| 1986 | $110,013 | $57,167 | $311,106 | --- | --- |
| 1987 | 130,952 | 49,011 | 89,299 | --- | --- |
| 1988 | 119,430 | 44,258 | 133,618 | $66 | $2,102 |

Good Shepherd itemized its "Other Deductions" for 1987 and 1988, as follows:

### 1987

| | | | |
|---|---|---|---|
| Management fees | $60,000 | Legal & professional | $14,797 |
| Travel expense | 2,833 | Entertainment | 359 |
| Advertising | 1,000 | Outside services | 4,522 |
| Repairs and maint. | 5,788 | | |

### 1988

| | | | |
|---|---|---|---|
| Outside services | $18,600 | Telephone & utilities | $ 6,930 |
| Misc. expenses | 953 | Engineering expenses | 50 |
| Management fees | 60,000 | Professional & legal | 35,931 |
| Travel expenses | 10,544 | Entertainment expenses | 610 |

Shareholders' Investments in Good Shepherd; Petitioners'
Deductions

Each petitioner was informed by Vebeliunas that it was
possible to buy shares in Good Shepherd, and information from
Vebeliunas was the only information each of the shareholders
considered in deciding to invest in Good Shepherd.

On account of the investments of the shareholders in Good
Shepherd, petitioners claimed losses for the years in issue as
follows:

| Petitioner(s) | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|
| Zards | --- | $6,791 | --- | --- |
| Weinman | --- | 84,225 | $33,629 | $20,392 |
| Donahue | --- | 387,263 | 143,118 | 96,733 |
| Vipulis | $126,483 | --- | --- | --- |

Vebeliunas

Vebeliunas was indicted in 1992 on more than 40 counts of
violating Federal statutes prohibiting conflicts of interest,
fraud, witness tampering, racketeering, interstate transportation
of money and securities obtained by fraud, and misapplication of

funds. Vebeliunas was found guilty on virtually all of those counts.

OPINION

I. Introduction

Under section 1366, a shareholder in an S corporation is entitled to take into account his or her pro rata share of the corporation's losses. See sec. 1366(a). Respondent has conceded that Good Shepherd is an S corporation, and we must determine the extent, if any, of Good Shepherd's allowable losses for 1986 through 1988. We must also determine whether petitioners are liable for certain additions to tax.

In support of her notices of deficiency that underlie these cases, respondent explained her adjustments with regard to Good Shepherd for 1986 through 1988 as follows:

> It is determined that the losses claimed on your income tax returns from Good Shepherd Home, Inc. are disallowed in full because you failed to establish:
>
> 1. That the losses were incurred in a trade or business for the production of income.
>
> 2. That the S-corporation was formed, entered into, operated or conducted for the purpose of making a profit, rather than for tax avoidance.
>
> 3. That the S-corporation status is valid. Alternatively, if it is established that your S-corporation is valid, you have not verified expenses allegedly giving rise to the losses were ever paid or incurred.

In the petitions, petitioners assign error to respondent's adjustments and to her determinations of additions to tax.

Petitioners have failed, however, to provide statements of fact on which they base their assignments of error as to respondent's determinations of additions to tax, as required by Rule 34(b).

II. Deficiencies in Tax

A. Ordinary and Necessary Business Expenses

In pertinent part, section 162(a) provides: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". To qualify for deduction under section 162(a), an item must (1) be paid or incurred during the taxable year, (2) be for carrying on any trade or business, (3) be an expense, (4) be a necessary expense, and (5) be an ordinary expense. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 85 (1992). By raising an issue of verification, respondent challenges whether petitioners have met the first qualification set forth above. Respondent has also challenged whether petitioners have met the second qualification. An item fails to meet the second qualification that it be for carrying on a trade or business if it is a preopening expense. A preopening expense is an expense incurred between the decision to establish a business and the actual beginning of business operations. See, e.g, Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965), original holding on this issue reaffd. 354 F.2d 410, 411 (4th Cir. 1965),

overruled on other grounds NCNB Corp. v. United States, 684 F.2d 285, 289 (4th Cir. 1982); Hardy v. Commissioner, 93 T.C. 684, 687-688 (1989); Jackson v. Commissioner, 86 T.C. 492, 514 (1986). As the Court of Appeals for the Fourth Circuit said in Richmond Television Corp. v. United States, 345 F.2d at 907:

> The uniform teaching of  * * * [certain prior] cases is that, even though a taxpayer has made a firm decision to enter into business and over a considerable period of time spent money in preparation for entering that business, he still has not "engaged in carrying on any trade or business" within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized.  [Fn. refs. omitted.]

Except for the interest, depreciation, and taxes deducted by Good Shepherd, all of Good Shepherd's deductions for 1986 through 1988 are deductions governed by section 162(a).

Petitioners bear the burden of proof.

### 1.  Verification

Respondent has challenged whether expenditures claimed by Good Shepherd were ever paid or incurred.  Petitioners have failed adequately to verify, or substantiate, those expenditures. For 1987 and 1988, Good Shepherd claimed deductions for travel and entertainment.  Petitioners have introduced no evidence that would satisfy the special substantiation requirements imposed by section 274(d) with regard to expenditures for travel and entertainment.  With regard to Good Shepherd's other expenditures claimed for deduction under section 162(a), for the most part,

petitioners apparently rely on a stipulated exhibit to satisfy their burden of proof. That stipulated exhibit (Exhibit 52) is described as "a copy of ledger sheets pertaining to expenses relating to the property in issue in the taxable years 1986, 1987, and 1988." Respondent, however, stipulates "only that Petitioners' Exhibit 52 represents a listing of expenses relating to the property in issue and does not stipulate that petitioners' Exhibit 52 had any legal substance or represented bona fide debts incurred by Good Shepherd." Petitioners have made no attempt to tie the entries on Exhibit 52 to the deductions claimed on Good Shepherd's returns. Petitioners have provided virtually no documents, such as canceled checks, invoices, or bank statements to back up the entries on Exhibit 52. Only one canceled check is in evidence, a check in the amount of $25,000, drawn to Lino Engineering Co. Vebeliunas testified that Lino Engineering was contracted for "renovation and change" at the property. Thus, it is not clear that the payment is deductible at all, because it may well be a capital expenditure. See sec. 263(a). Also in evidence are statements showing payments of $1,625, $2,887, $6,250, $2,025, $325, $820, and $12,143 to various individuals in 1988. Since there are no deductions on Good Shepherd's return for 1988 for (1) compensation to officers or (2) salaries or wages, we assume that those payments, if made, were for

management services.  Again, we do not know whether such payments, if made, are properly deductible under section 162(a).

If a claimed deduction is not adequately substantiated, we are permitted to estimate expenses when we are convinced from the record that the taxpayer has incurred such expenses.  Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).  However, we require a basis upon which an estimate may be made.  Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).  Here, for the most part, we have no such basis.  Moreover, since any expense we would estimate would constitute a nondeductible preopening expense, no estimate is necessary.

### 2.  Preopening Expenses

The parties have stipulated, and we have found, that Good Shepherd did not operate a nursing home or other health care facility in any of the years in issue.  On brief, petitioners state that, beginning in 1985:

> The corporate business of Good Shepherd was to buy and sell distressed properties, fix them, and resell or operate them.  In the case of the Property, "fixing" at first meant getting approval for a nursing home license since at or near the time of purchase the nursing home had 90% of improvements needed to operate a nursing home.  It was the most logical way to turn this distressed Property around. Unfortunately, the nursing home approval was never obtained.  Every time it seemed near at hand, another problem would crop up.  Even though a licensed health facility manager was in place, unexpected environmental and construction problems had to be dealt with.  Efforts to obtain a nursing home license began in 1985 and continued through 1988, the years in question in this case.  * * *

In support of an averment that the business of good Shepherd was to buy, fix-up, and sell distressed properties, petitioners offer the testimony of Vebeliunas, president of Good Shepherd during the years in issue. Vebeliunas testified that the purpose of Good Shepherd was "to own and operate real estate properties and services related to the real estate properties."

Vebeliunas' testimony on that point strikes us as enlightened hindsight, and we give it no credence. First, the articles of incorporation of Good Shepherd specifically provide that it is formed for the purpose of carrying on the business of nursing homes and health care facilities. Only generally may it carry on other businesses. There is no evidence that the directors of Good Shepherd ever authorized it to engage in the business described on brief by petitioners. Second, Vebeliunas was indicted in 1992 on more than 40 counts of violating Federal statutes prohibiting conflicts of interest, fraud, witness tampering, racketeering, interstate transportation of money and securities obtained by fraud, and misapplication of funds. Vebeliunas was found guilty on virtually all of those counts. Although, in many respects, we found Vebeliunas' testimony forthright and convincing, in other respects we found it lacking in credibility. He played a role in each of Good Shepherd, Litas, and Kasa, and his was the only information relied on by the shareholders in deciding whether to invest in Good Shepherd.

Petitioners also rely on Vebeliunas to avoid the additions to tax for negligence.  We believe that he has an interest in seeing petitioners prevail.

We find that at no time during the years in issue was Good Shepherd in the business of buying, fixing-up, and selling distressed properties.  Moreover, we find that at no time during those years did Good Shepherd carry on any trade or business within the meaning of section 162(a).  Expenditures that otherwise would have qualified for deduction under section 162(a), and that related to the establishment of a nursing home or health care facility, were preopening expenses, which for that reason, are nondeductible.  Moreover, any expenditures that Good Shepherd may have made with regard to the elderly individuals remaining in residence on the property when it was acquired from Ona Pranckeviciute were expenditures that constitute part of the cost of the property.  For that reason, such expenditures are nondeductible.  See sec. 263(a).

B.  <u>Taxes</u>

Section 164(a) allows a deduction for certain taxes paid or accrued during the taxable year.  For 1986, Good Shepherd claimed a deduction for taxes of $66.  Petitioners have failed to substantiate that such taxes were paid.  For that reason, no deduction is allowed.

C.  Depreciation

Section 167(a) allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business, or * * * of property held for the production of income."  The depreciable basis of property acquired by purchase is cost.  See sec. 167(g).  If depreciable and nondepreciable property, such as improved real estate, is bought for a lump sum, the purchase price must be allocated between the land (nondepreciable property) and the depreciable improvements (e.g, buildings).  See sec. 1.167(a)-5, Income Tax Regs.  Depreciation deductions may not be claimed until an asset is placed in service.  Rybak v. Commissioner, 91 T.C. 524, 561 (1988); sec. 1.167(a)-10(b), Income Tax Regs.

On its 1985 return, Good Shepherd claimed a deduction for depreciation of $13,583, based on a total cost basis for depreciable property of $833,000.  We assume that such depreciable property is a portion of the property.  Deductions for depreciation as set forth in our findings of fact were claimed by Good Shepherd for 1986 through 1987.  In our findings of fact, we have recited a description of the property as an improved 86-acre tract.  Petitioners have proposed, although we have not found, that the purchase price paid by Good Shepherd for the property was over $1 million.  Petitioners have failed to show on what basis Good Shepherd allocated the purchase price of

the property between land and any depreciable buildings or other depreciable improvements. Thus, petitioners have failed to substantiate Good Shepherd's deductions for depreciation. Moreover, petitioners have failed to show that any buildings or other depreciable improvements were placed in service in any trade or business or profit-making activity during the years in issue. We already have concluded that, during those years, Good Shepherd was engaged in preopening activities with regard to the business of operating a nursing home. Good Shepherd was not then engaged in any trade or business or other profit-making activity, and, for that reason alone, Good Shepherd may not claim any deductions for depreciation for those years.

D. <u>Interest</u>

Section 163(a) states: "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Deductible interest is a payment for the use or forbearance of money. <u>Deputy v. du Pont</u>, 308 U.S. 488, 497 (1940). It is well settled that the indebtedness referred to in section 163(a) must be genuine, and economic realities govern over the form in which a transaction is cast. <u>Knetsch v. United States</u>, 364 U.S. 361, 365-366 (1960). An indebtedness is an existing, unconditional, and legally enforceable obligation for the payment of a principal sum. E.g., <u>Landry v. Commissioner</u>, 86 T.C. 1284, 1308 (1986).

A taxpayer may deduct as interest on its indebtedness interest paid by the taxpayer on a mortgage upon real estate of which the taxpayer is the legal or equitable owner even though the taxpayer is not directly liable upon the bond or note secured by such mortgage. Sec. 1.163-1(b), Income Tax Regs. However, only interest paid or accrued on a mortgage on property for the period after the taxpayer becomes the legal or equitable owner of the property is deductible under section 163. Hyde v. Commissioner, 64 T.C. 300, 306 (1975) (interest accruing before, but paid by the taxpayer, must be capitalized).

We are unconvinced that Good Shepherd either made any payments of interest during the years in question or had any genuine indebtedness that would entitle it a tax deduction for interest paid or accrued. No schedule particularizes the interest deducted on the Good Shepherd returns. Petitioners have not introduced into evidence any check or other direct evidence that shows that Good Shepherd paid either principal or interest on any indebtedness. Indeed, journal entries made by Good Shepherd regarding 1985, 1986, and 1987 indicate that no payments of principal were made on either the first or second Kasa obligations during such periods.

We assume that the indebtedness with regard to which petitioners claim interest deductions are (1) the Salesian obligation, (2) the first Kasa obligation, and (3) the second Kasa obligation.

We are convinced that, on some date, Good Shepherd acquired title to the property. A title insurance policy effective December 13, 1990, states that title to the property is, on that date, in the name of Good Shepherd. Nevertheless, we have in evidence no deed or other document conveying title to Good Shepherd on that date or before. We know that title to the property passed to Litas by quitclaim deed in September 1985. We also know that, in December 1985, Litas made the first Litas indenture in favor of Salesian. We also know that, in December 1986, Litas made the second Litas indenture in favor of Salesian. There is no evidence that, during the years in question, Good Shepherd assumed that Salesian obligation. Petitioners' position is that Litas, on behalf of Good Shepherd, assumed the Salesian obligation. Vebeliunas testified that Litas acted on behalf of Good Shepherd in that respect. Again, such testimony strikes us as enlightened hindsight, and we give it no credence. More importantly, if Litas was acting on behalf of Good Shepherd, it was putting its own credit on the line when it made the two indentures. There is, however, no evidence of any agreement by Good Shepherd to reimburse Litas for any payments it was required to make pursuant to the indentures. The logic of that omission is that Litas was an obligor on its own behalf, and not on behalf of Good Shepherd. We do not understand all that went on here, but that is petitioners' fault. They have the burden of proof. Suffice it to say that they have not convinced us that Good

Shepherd either paid or was obligated to pay any amount on the Salesian obligation during the years in question, and we so find.

We reach a similar conclusion with regard to the first Kasa obligation. We are aware, of course, of the consolidation agreement, entered into by Kasa and Good Shepherd, and purporting to consolidate the mortgages securing the first and second Kasa obligations. Nevertheless, we have no evidence that Good Shepherd ever assumed the first Kasa obligation, and we have the Litas assumption, whereby Litas did assume the first Kasa obligation. As with the Salesian obligation, we are not convinced that Good Shepherd either paid or was obligated to pay any amount on the first Kasa obligation during the years in question, and we so find.

The second Kasa obligation was executed by Good Shepherd. There is no evidence of an assumption by Litas. To be entitled to a deduction for interest paid or accrued on the second Kasa obligation, petitioners have the burden of showing that the indebtedness is genuine. In the stipulation of facts entered into by the parties, respondent stipulated to copies of the second Kasa obligation and second Kasa mortgage. Respondent added, however, that she did not stipulate that those documents had any legal substance or represented a bona fide debt incurred by Good Shepherd. Beyond petitioners' promissory note to Kasa, petitioners have introduced no evidence, such as bank statements or other documents, to show that any sum actually was received by

Good Shepherd in consideration of the second Kasa obligation. More importantly, as we have said, petitioners have introduced no evidence that Good Shepherd paid anything, either principal or interest, with regard to the second Kasa obligation. We are not convinced that the second Kasa obligation represented true indebtedness or that Good Shepherd paid any interest with respect thereto, and we so find.

For the reasons stated, we determine that Good Shepherd may not claim any interest deductions for either 1986, 1987, or 1988.

E. Conclusion

We sustain the deficiencies in tax determined by respondent for the reasons stated. Therefore, we need not address respondent's alternative grounds that Good Shepherd was organized and operated for purposes of tax avoidance rather than to make a profit.

III. Additions to Tax

A. Negligence

Section 6653(a) imposes one or more additions to tax where an underpayment of tax is due to negligence or intentional disregard of rules or regulations (hereafter, without distinction, negligence). Respondent has determined additions to tax for negligence with respect to all petitioners. Section 6653(a)(1), for returns due in 1989, section 6653(a)(1)(A), for returns due in 1987 and 1988, and section 6653(a)(1), for returns due in 1986, impose an addition to tax equal to 5 percent of the

entire underpayment if <u>any</u> portion of such underpayment is due to negligence. Section 6653(a)(1)(B), for returns due in 1987 and 1988, and section 6653(a)(2) for returns due in 1986, impose an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment due to negligence. "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985) (quoting <u>Marcello v. Commissioner</u>, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part, revg. in part 43 T.C. 168 (1964)). Petitioners bear the burden of proof. Rule 142(a).

As we said in section I., <u>supra</u>, petitioners have failed to plead facts in support of their assignment of error with regard to respondent's determinations of additions to tax. On brief, petitioners argue that they did not act negligently because they relied "on the advice of their accountant", whom we assume was Vebeliunas. None of petitioners testified. Vebeliunas testified that he was never an accountant for the Zardses. The parties have stipulated that information from Vebeliunas was the only information each of petitioners considered in deciding whether to invest in Good Shepherd. When asked what information he gave petitioners, Vebeliunas testified as follows:

> It's a difficult task to remember that many years ago and to reconstruct the conversation. If the Court would permit me, we have as much as 500 people invested with us and many of them talk to me.

To the best of my recollection, this was presented as a distressed property with the possibility of profit and each distressed property acquired is usually employed for whatever was built.

We had apartment houses. We had hotels. This was the first one that was a health facility.

I addressed myself to the value of the property, to the placement of the property and so explained it to the investors. The actual narrative of it, I do not remember.

It is true that reliance on the advice of an expert can, in some circumstances, defeat a claim of negligence. E.g., Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976). The long and the short of it, however, is that this is not one of those cases. Not only could Vebeliunas not remember well what he advised petitioners, petitioners have not pointed out to us any testimony by Vebeliunas that relates at all to the tax consequences of their investments. Petitioners have failed to carry their burden of proving that they were not negligent, and we so find. We uphold respondent's determinations of negligence in all respects.

B. Substantial Understatement

Respondent has determined additions to tax under section 6661 for all years in issue and for all petitioners except for petitioners Zards. For returns due before January 1, 1990, section 6661 provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial

understatement. An understatement is "substantial" when the understatement for the taxable year exceeds the greater of (1) 10 percent of the tax required to be shown or (2) $5,000. The understatement is reduced to the extent that the taxpayer has (1) adequately disclosed his or her position, or (2) has substantial authority for the tax treatment of an item. Sec. 6661; sec. 1.6661-6(a), Income Tax Regs. Petitioners bear the burden of showing that they are not subject to the addition to tax determined by respondent. Rule 142(a).

Petitioners have averred no facts in support of their assignment that respondent erred in determining an addition to tax under section 6661. Moreover, on brief, petitioners make no argument disputing respondent's section 6661 determinations. We assume that petitioners have abandoned their claims of error with regard to section 6661. On that basis, respondent's determination of additions to tax under section 6661 are sustained.

<u>Decisions will be entered for respondent</u>.